GOLDEN v. COMMISSIONER OF INTERNAL REVENUE.

GOLDEN'S ESTATE v. SAME.

ANDERSON et al. v. SAME.

Nos. 7198–7200.

Circuit Court of Appeals, Third Circuit.

June 29, 1940.

BUFFINGTON, Circuit Judge, dissenting.

———◆———

William A. Seifert, William W. Booth, Robert L. Kirkpatrick, and Reed, Smith, Shaw & McClay, all of Pittsburgh, Pa., for petitioners.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Helen R. Carloss, Sp. Assts. to Atty. Gen., for respondent.

Before BIGGS, CLARK, and BUFFINGTON, Circuit Judges.

CLARK, Circuit Judge.

The income tax repercussions of insurance carried by corporations on the lives of their officers have turned upon the distinction between two simple classes of cases. The first is where the corporation receives the proceeds of such insurance as beneficiary named in the policy. The amounts so received are not taxable to it, they being within the statutory exclusion from gross income of "amounts received under a life insurance contract", Revenue Act of 1934, sec. 22(b) (1), 26 U.S.C.A. Int.Rev.Acts, page 670, and see United States v. Supplee-Biddle Hardware Co., 265 U.S. 189, 44 S.Ct. 546, 68 L.Ed. 970. The second, as might be expected, deals with the next step—transference of the insurance proceeds from the corporation-beneficiary to its stockholders. Now the stockholders do not receive those proceeds "under a contract of insurance". The contract goes no further than to create a legal relationship between the insurer, the insured officer, and the beneficiary corporation. The amounts received by the stockholders fall rather into the broad category of dividends. They have accordingly been taxed to the stockholders, despite their physical segregation from the corporate assets coupled with a corporate undertaking (by appropriate resolutions passed prior to the insured officer's death) to pay them over to the stockholders when received, Cummings v. Commissioner, 1 Cir., 73 F.2d 477; May v. Commissioner, 20 B.T.A. 282.

The cases at bar fall into this second class. They present, as do the Cummings and May cases, the segregation of insurance proceeds in accordance with a preconceived and legally implemented plan of distributing them pro rata among stockholders. There is, however, an important difference in method. The procedure employed goes beyond the mere adoption of resolutions and opening of special bank accounts. Here, the Golden-Anderson Valve Specialty Company, an absolute owner and beneficiary of eleven unmatured policies on the life of its president, Charles B. Golden, entered into a contract with a trust company. The contract was labeled "Agreement for the Distribution of Insurance". Under it, the policies were delivered and made payable to the trust company by the corporation: the trust company engaged to collect their proceeds when the occasion arose and distribute them to the holders of stock in the corporation at that time. This contract has been fulfilled. Our problem is to determine the consequences of that fulfillment. Are the amounts received by the stockholders from the trust company exempt insurance monies or taxable dividends? Or, further, are they in the nature of both?

We are unable to detect any substantial flaw in the appellant stockholders' argument that their receipts from the trust company are amounts received under a life insurance contract. Without going into details or technicalities, it seems plain from the record that the trust company was duly named beneficiary of all eleven policies. The issuing insurance companies

were all notified, and the change of beneficiary was in one way or another endorsed by them on the face of each policy. That the change was effective is further buttressed (pragmatically speaking) by the fact that collections seem to have been made on the policies by the trust company without any difficulty whatsoever. The trust company was, therefore, included in the legal relationships created by the eleven life insurance contracts. It received the insurance proceeds directly under those contracts. If it acted as trustee for the stockholders, the latter likewise received them under those contracts "in trust" within the scope of long standing regulations particularizing the insurance exemption, Regulations 86, Art. 22(b) (1)-1. Again without going into details or technicalities, we think it clear that the agreement between the Valve Company and the trust company set up (despite certain reservations of rights in the policies to the corporation) a valid unfunded insurance trust.[1] The formal transfer of monies from the insurance company to the stockholders via the trust company occurred, therefore, in the manner contemplated by the exemption regulations.

The qualification inherent in our use of the adjective "formal" proceeds from a conviction that the stockholders' receipts at bar must also be classified as dividends. These are broadly defined in the statute:

"(a) *Definition of Dividend.* The term 'dividend' when used in this title * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, out of its earnings or profits accumulated after February 28, 1913.

"(b) *Source of Distributions.* For the purposes of this Act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits." Revenue Act of 1934, Sec. 115, 26 U.S.C.A.Int.Rev. Acts, page 703.

At the time distributions were made to the stockholders by the trust company, the Valve Company had in its treasury an amount of orthodox undistributed earnings and profits accumulated since February 28, 1913, which exceeded the amount of the distributions. That being so, the conclusive presumption of section (b) above removes the nice question of whether life insurance proceeds are "earnings and profits" from the case. It is comforting, however, to note that an acute investigator of the subject has emerged with an affirmative answer.[2] The distributions at bar are, therefore, dividends, if they were "by" the Valve Company to its stockholders. We think they were.

▮▮ A corporation cannot, and does not, make a gift of its assets to shareholders. It may, however, transfer surplus assets to them in the form of dividends. The case at bar unquestionably instances a transfer of surplus assets to stockholders. The eleven policies certainly constituted corporate assets before the distribution agreement with the trust company. Even after the agreement the Valve Company continued to deplete its coffers by paying premiums to keep some of the policies alive. Yet ensuant upon Mr. Golden's death, the corporation had nothing, the stockholders everything. A dividend transfer, actively engineered by the corporation (which acquired the policies, and entered into the distribution agreement), occurred somewhere along the line. The only difficulty is in fixing the exact point.

If the transfer occurred immediately upon the execution of the distribution agreement, the dividend would be measured by the then cash surrender value of the policies, and not, as the Commissioner has done at bar, by the amount of their proceeds. Our view of the matter, however, is that the transfer did not so occur. Practically speaking, the stockholders could receive no cash until the policy proceeds were collected. Technically speaking, they received but little else until then. The agreement called for distribution to (or, if one prefers, the policies were held in trust for) only those persons who held stock when the proceeds were collected. We have spoken, moreover, of certain policy rights reserved by the Valve Company in the distribution agreement. These, we think, constituted a retention of incidents of ownership sufficient to delay the occurrence of a transfer, as that concept has

---

[1] See 1 Scott on Trusts secs. 17.4, 57.-3, 82.1, 84.1; Vance, Handbook of the Law of Insurance, sec. 158, p. 606.

[2] Paul, Ascertainment of "Earnings or Profits" for the Purpose of Determining Taxability of Corporate Distributions, Selected Studies in Federal Taxation, Second Series, 149, 161–165. For reasoning along similar lines with respect to the related concept of "income", see Magill, Taxable Income, pp. 335–338.

been developed in the surely analogous fields of estate and gift taxation,[3] until those incidents were extinguished at Mr. Golden's death. That being so, the Commissioner's measure is the correct one.

■ We are confronted, then, with the unusual spectacle of two provisions of the same enactment in direct collision with each other. Both speak in specific terms, 1 Paul and Mertens, Law of Federal Income Taxation, sec. 3.10; yet one imposes tax, the other exempts from tax. If there is any force whatever in the hornbook rule that exemptions should be narrowly construed against the taxpayer, 1 Paul and Mertens, Law of Federal Income Taxation, sec. 3.30, the exemption should and must give way. Furthermore, it is to

be borne in mind that the eleven policies indemnified the Valve Company against the loss occasioned by the cessation of Mr. Golden's services. That loss is essentially one of future earnings and profits—earnings and profits which could only be transferred to stockholders as taxable dividends, see Magill, Taxable Income, above cited, p. 338.

■ One minor question remains. Mr. Golden, the insured president of the Valve Company, held, as might be expected, a large portion of its stock. Did his insurance dividend accrue to him individually in the period before his death, or to his estate in the period after his death? The Board's allocation of the dividend to the later period is, we think, plainly correct.

---

[3] See generally, Paul, Life Insurance and the Federal Estate Tax, 52 Harvard Law Review 1037, 1066 et seq.; Fraenkel, Federal Taxation of Insurance Policies, 5 Brooklyn Law Review 140, 147 et seq.; Magill, The Federal Gift Tax, 41 Columbia Law Review 773, 789. Three rights were reserved by the Valve Company. The first, that of receiving dividends on the policies, would not seem of itself sufficiently substantial to negative a present transfer, Keefe v. Broderick, D. C., 25 F.Supp. 957; Parker v. Commissioner, 30 B.T.A. 342, affirmed, 8 Cir., 84 F.2d 838. The second raises too many curious and doubtful points to warrant profitable consideration here. It consists of the right to change the beneficiaries with the consent of the "Trustee" (trust company) and of the "Trust Beneficiaries" (stockholders). One may observe in passing that adversity of interest as between a close corporation and its stockholders is questionable to say the least. The third right reserved, however, is clearly incompatible with any shift of economic benefit to the stockholders prior to the maturity of the policies. The Valve Company retained the right to hypothecate the policies not only to the extent of assigning them, but also to the extent of selling them. So, for all practical purposes the corporation continued its dominion and control over the policies. If the policies were assigned, the stockholders' interest in them would be destroyed in proportion to the unpaid amount of the loan the corporation chose to secure, Vance, Handbook of the Law of Insurance, above cited, secs. 168, 169, pp. 644, 645. If hypothecation resulted in a sale, the stockholders's interest would be destroyed altogether. Only Mr. Golden's death could eliminate these, from the stockholders' point of view, disturbing

possibilities. As a consequence no transfer in the gift or state tax sense took place until that time, see Regulations 80, Art. 25; Chase National Bank v. United States, 278 U.S. 327, 49 S.Ct. 126, 73 L.Ed. 405, 63 A.L.R. 388; Sampson v. United States, D.C., 1 F.Supp. 95; Pennsylvania Co. for Insurances v. Commissioner, 29 B.T.A. 1306; Sharp v. Commissioner, 30 B.T.A. 532. Former decisions of this Court have reached an ostensibly inconsistent conclusion, Pennsylvania Co. for Insurances v. Commissioner, 3 Cir., 79 F.2d 295, certiorari denied 296 U.S. 651, 56 S.Ct. 310, 80 L. Ed. 463 (reversing Pennsylvania Co. for Insurances v. Commissioner, 29 B.T.A. 1306, above cited); McKelvey v. Commissioner, 3 Cir., 82 F.2d 395; Commissioner v. Sharp, 3 Cir., 91 F.2d 804, affirming Sharp v. Commissioner, 33 B.T.A. 290 (reversing Sharp v. Commissioner, 30 B.T.A. 532, above cited). They proceed, however, upon the notion that under applicable local law and the wording of the policies there in question, the right to borrow cannot be exercised without the consent of the beneficiary where, as here, the right to change the beneficiary is not unrestrictedly reserved. The notion seems rather tortuous, see Schuberth v. Prudential Insurance Company, 86 Pa. Super. 80; 2 Couch, Cyclopedia of Insurance Law, sec. 335; Vance, Handbook of the Law of Insurance, above cited, sec. 147, p. 559. Yet, even if such consent is requisite as between the Valve Company and the trust company (the beneficiary named in the policies), their collateral distribution agreement immediately supplies it. For, as specifically provided in that document, the right to hypothecate might be exercised by the Valve Company without the trust company's consent.

"All events creating the liability"[4] for that dividend had assuredly not occurred prior to Mr. Golden's death, or even—to split a metaphysical hair—up to and including the moment of his death. For one thing, payment of the dividend was conditional upon payment of the policy proceeds. For another, that payment was in turn conditional upon receipt by the insurance companies of the proofs of death required by their policies. Neither condition, by hypothesis, could be complied with instantaneously.

The decision of the Board of Tax Appeals is affirmed.

BUFFINGTON, Circuit Judge (dissenting).

This case turns on the construction and effect of the written agreement signed by the corporation, the stockholder, Charles E. Golden (the insured) and the trustee. When the agreement was entered into and at all times thereafter the corporation had on hand ample surplus to pay, and it continued to pay, all premiums thereon. It will be noted that while in form the payments were made by the corporation, yet in reality the money thus paid was the property of the stockholders and to this extent said premiums consumed pro tanto the amount of dividends thereafter payable to Charles E. Golden, the insured.

By the above analysis it is clear that in effect these premiums were really paid by the stockholder through payments in form made by the corporation. In substance these facts are shown by stipulation as follows: "The amount of undistributed earnings and profits of the Company was at all times in excess of the aggregate cash surrender value of, or premiums paid on, said policies of insurance, and was on April 9, 1934, in excess of the total amount collected by the Fidelity Trust Company under said policies."

By the tripartite agreement, what the stockholder, Golden, and his corporation had in view was that "the corporation and the stockholder desire that upon the death of the stockholder the insurance so carried on his life shall be paid to the Trustee." This purpose was to be effected by the act of the corporation, viz, "The Corporation has or will hereafter cause to be made payable to the Trustee, the policies of insurance carried on the life of the Stockholder, in which the Corporation is now named as beneficiary."

It will thus appear that by the agreement and the act of the corporation the policies were surrendered by the corporation—"The trustee hereby acknowledges the receipt of the policies of insurance as stated above and agrees to hold them subject to the conditions herein set forth"—and all ownership and control and legal title thereof so far as the corporation was concerned was vested in the trustee subject to its obligation and agreement that "Upon receipt of due notice of the death of the said Stockholder, the Trustee shall collect the proceeds of the policies of insurance on his life, which have been deposited hereunder, and shall distribute the same in manner following: (1) The said proceeds shall be paid directly to the several stockholders of the Corporation in amounts proportionate to the number of shares of stock of the Corporation which they may respectively own at the date of such distribution."

It will thus appear that by the agreement the corporation ceased to be the beneficiary and the trustee became the formal legal beneficiary and the stockholder the real and equitable owner of the policy.

Any powers thereafter to be exercised by the corporation were stated and only exercisable with the consent of the stockholder, viz, "The corporation and the stockholder reserve the right at all times without the consent or approval of the Trustee: (a) To hypothecate policies of insurance deposited hereunder for the purpose of making loans thereon. (b) To receive all dividends which may accrue on account of said policies during the lifetime of the Stockholder." And further, the corporation expressly renounced the right "to sell or assign any of the policies deposited hereunder. (b) To exercise any option or privilege granted in the said policies not hereinabove specifically reserved to itself. (c) To change the beneficiary in the said policies without the formal consent of the stockholders and the approval of the Trustee."

It will be noted that by the last quoted provision of the agreement the corporation concedes that it is no longer the beneficiary and that it has no power left to change the beneficiary "without the formal

---

[4] 1 Paul and Mertens, Law of Federal Income Taxation, above cited, sec. 11.74.

consent of the stockholders and the approval of the trustee."

It is contended that the present case is controlled by Cummings v. Commissioner, 1 Cir., 73 F.2d 477, 479. I do not so regard it. The gist of the transaction in that case is summarized as follows: "It seems to us that the records of the company clearly show that it was the intent of all parties that these proceeds should go to swell the assets of the company. It paid the premiums, took the policies out in its own name, and it was understood both by the officers of the company and the common stockholders that when the proceeds thereof were received they would be so mingled with the other company assets that it would be necessary to declare a dividend in order to separate and give each individual stockholder a right to his proportionate part according to the number of shares in the company he held."

It will be observed that in that case the company never surrendered or renounced any right, never ceased by its own agreement to be the beneficiary—a situation wholly different from the present. There the corporation was, and never ceased to be, the beneficiary. It collected the proceeds of the policy as a beneficiary, appropriated such assets to surplus and distributed it as such.

In my view the facts and acts of the parties are wholly different and the Board in the present case committed error in sustaining the contention of the Commissioner.

For these reasons I respectfully dissent from the opinion of the court.