CHARLES J. AND FLORENCE THORNLEY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 385–62. Filed October 30, 1963.

*James R. McGowan*, for the petitioners.
*Joseph W. Salus II*, for the respondent.

OPINION

FAY, *Judge:* The respondent determined a deficiency in the petitioners' income tax in the amount of $5,168.15 for the taxable year 1958. The only issue for decision is whether the Thornley Supply Co. made a taxable distribution, consisting of eight insurance policies on the life of Charles J. Thornley, to its shareholder, Charles J. Thornley, in 1958.

All of the facts have been stipulated and are so found.

Charles J. Thornley (hereinafter referred to as petitioner) and Florence Thornley are husband and wife with residence at North Attleboro, Mass. They filed a joint income tax return for the taxable year 1958 with the district director of internal revenue for the district of Massachusetts. Florence Thornley is a party to this proceeding by virtue of having signed the aforementioned return. Petitioner has at all times relevant to this proceeding reported income for Federal income tax purposes on the cash receipts method of accounting.

The Thornley Supply Co. is a corporation incorporated under the laws of Rhode Island on May 1, 1925. At all relevant times, the Thornley Supply Co. has engaged in the business of wholesaling and

retailing plumbing and heating supplies, with its place of business located at 40 Thornley Street, Pawtucket, R.I.

Albert L. Thornley (hereinafter referred to as Albert) was petitioner's brother. From the inception of the Thornley Supply Co. in 1925 until Albert's death on August 25, 1958, petitioner and Albert owned an equal number of shares of Thornley Supply Co. stock and between them they owned all of the outstanding and issued shares.

On February 27, 1936, petitioner, Albert, and the National Bank of Commerce & Trust Co. of Providence, R.I. (hereinafter referred to as National), executed an instrument designated as a "Corporation Insurance Trust Agreement." The basic purpose of the agreement was to provide a fund consisting of insurance proceeds which would be available to the surviving shareholder upon the death of his coshareholder for the acquisition of the latter's stock in the Thornley Supply Co. Pursuant to the agreement the life of each shareholder was to be insured and the policies were to be made payable to National, the trustee under the agreement. In addition, the agreement provided in pertinent part that:

(1st) This trust shall cover in respect to such policies only the money that may accrue or become payable thereon at the death of the respective insured, and during the lifetime of the insured under any of said policies the Stockholders may jointly and without the consent of the Trustee exercise every privilege and receive any benefits granted under any of said policies and may likewise assign, pledge, release or surrender said policies, and the said Trustee shall be bound thereby.

(2nd) The Stockholders agree forthwith to deposit with the Trustee endorsed in blank all their stock and any additional or other stock which they may acquire from time to time in the corporation, either as stock dividends or otherwise, transferring to the Trustee legal title to such stock and the shares represented thereby.

(3rd) The Trustee agrees to hold the stock in the names of the Stockholders and to allow them to vote and to receive all dividends paid thereon. * * *

(4th) On the death of either Stockholder the Trustee on receiving the net proceeds of the insurance on his life shall deliver to the surviving Stockholder such number of shares of stock standing in the name of the deceased Stockholder as such proceeds suffice to purchase at the price hereinafter set forth. The surviving Stockholder shall have the right at any time within sixty (60) days from the date of death of such Stockholder to purchase at the same price any part or all of such deceased Stockholder's shares which the proceeds of policies on his life are insufficient to purchase, and may pay for the same in monthly instalments extended over a period not to exceed five (5) years. If the cash received by the Trustee is in excess of the amount necessary to purchase such stock the surplus shall be paid over to the surviving Stockholder.

(5th) The purchase price of said stock may be fixed by agreement of the Stockholders, which agreement shall be signed by the Stockholders and delivered to the Trustee after the date of this Agreement, and such letters may be delivered to the Trustee from time to time, and the price named in the letter of most recent date delivered to the Trustee shall control, provided such

letter is dated not over six (6) months prior to the death of the first of said Stockholders to die, and in case of the failure to file such agreement or agreements with said Trustee, or in case of no such agreement dated not over six (6) months prior to the death of the first of said Stockholders to die, the purchase price of said stock shall be the actual book value thereof as agreed upon by said Trustee and the surviving Stockholder or, in the absence of such agreement, as determined by an accountant to be selected by said Trustee (who may be the Trustee's auditor) upon whose determination said Trustee may conclusively rely. In computing such book value there shall not be included as a corporate asset either the value of or the proceeds of or any premiums paid upon any insurance on the life of either of said Stockholders which may then be the subject of this Agreement.

\* \* \* \* \* \* \*

(7th) At the death of either of said Stockholders this Agreement shall terminate as to the stock of the survivor, which shall forthwith be delivered to him, and shall also terminate as to the policies on his life, which policies shall be forthwith delivered to him without consideration, said Trustee releasing its interest therein if necessary.

\* \* \* \* \* \* \*

(9th) This Agreement may be amended or revoked by a writing delivered to the Trustee, signed by both Stockholders. A revocation shall also be effected by the payment of a final dividend in liquidation by the corporation. On any revocation, partial or complete, the Trustee shall be entitled to reasonable compensation for it services.

On March 29, 1951, the petitioner, Albert, and the Rhode Island Hospital Trust Co., the successor trustee to National (hereinafter referred to as trustee) executed an "Amendment to Corporation Insurance Trust Agreement." The purpose of the amendment was to make the Thornley Supply Co. a party to the agreement and to alter certain provisions in the agreement of February 27, 1936. As a result of this amendment, paragraph (1st) of the original agreement was amended to read that:

during the lifetime of the insured under any of said policies the Stockholders and the Company may together, but without the consent of the Trustee, exercise every right and privilege which either of the Stockholders or the Company may have under any of said policies and may otherwise deal with said policies in any manner permitted thereby, and the rights of the Trustee shall be subject to any such action.

As a result of the amendment, paragraph (4th) of the original agreement was amended to read that:

Upon the death of either Stockholder, the Company shall purchase the stock of the deceased Stockholder at the price determined as hereinafter provided, and in accordance with all other terms and conditions of this agreement.

Paragraph (5th) of the agreement, as amended, provided in part that "In no event shall the purchase price be determined to be less than the amount of insurance collected on the life of the decedent."

148

Paragraph (6th) of the agreement, as amended, provided, in part, that:

In the event that the purchase price of the stock does not exceed the amount of the insurance proceeds collected by the Trustee under this indenture, the Trustee shall deliver such proceeds * * * to the personal representative of said decedent * * * and shall deliver the certificates representing the stock of the decedent to the Company in proper form for transfer to it.

Paragraph (7th) of the agreement, as amended, provided that:

In the event that the purchase price shall exceed said insurance proceeds, the trustee is authorized and empowered to execute an agreement with the Company and the personal representative of the decedent setting forth the terms of payment of the excess of the purchase price over said insurance proceeds, which may include installment payments over a period not to exceed five (5) years from the date of death of the decedent. The amount of the insurance proceeds and all payments made pursuant to such agreement shall be paid to the trustee under said indenture dated February 27, 1936, as then amended, or to the personal representative of said decedent if said trust be not then in existence. The stock of the decedent shall be held by the trustee hereunder as security for the performance of said agreement. The agreement may contain such additional terms as the trustee may determine for realization upon said security in the event of default in said agreement.

Paragraph (8th) of the agreement, as amended, provided that:

Upon the death of either stockholder this agreement shall terminate as to the stock deposited by the survivor and the insurance policies on the life of the survivor, and the trustee shall, without charge or consideration therefor, deliver to such survivor all of the stock which shall have been deposited by him under this agreement and all insurance policies on his life, and the trustee shall release to such survivor all of its interest in such insurance policies.

Paragraph (9th) of the agreement, as amended, provided that "The Company agrees that it will maintain in full force and effect the policy or policies of insurance upon the lives of the Stockholders."

Paragraph (10th) of the agreement, as amended, provided in part that "This agreement may be amended or revoked by a writing delivered to the Trustee, signed by both Stockholders and the Company."

Eight life insurance policies with petitioner as the insured were deposited with National under the corporation insurance trust agreement. Five of the policies were issued pursuant to the application of the petitioner and were made payable to the trustee of the insurance trust. These policies may be described as follows:

| Date issued | Insurer | Policy No. | Type | Face amount |
|---|---|---|---|---|
| May 11, 1936 | Northwestern Mutual Life Insurance Co. | 2722388 | Ordinary life | $5,000 |
| Oct. 3, 1937 | ____do____ | 2839371 | ____do____ | 2,000 |
| Do | ____do____ | 2839372 | ____do____ | 2,000 |
| Do | ____do____ | 2839373 | ____do____ | 1,000 |
| Do | ____do____ | 2839374 | ____do____ | 1,000 |

Attached to each of the foregoing policies was a designation of corporate trustee as beneficiary which was signed by petitioner and which reserved to him the right to change or revoke the beneficiary designation, to borrow on the policy, and to surrender the policy for its cash value.

The three remaining policies were issued upon the application of the Thornley Supply Co. and provided that the proceeds would be payable upon the death of petitioner to the Thornley Supply Co. The three applications recited that any policy issued upon this application shall belong to and be under the control and disposition of the Thornley Supply Co. without the consent of the insured. These policies may be more fully described as follows:

| Date issued | Insurer | Policy No. | Type | Face amount |
|---|---|---|---|---|
| Apr. 30, 1937 | Northwestern Mutual Life Insurance Co. | 2801811 | Ordinary life | $10,000 |
| Jan. 14, 1944 | _____do_____ | 3268889 | _____do_____ | 11,000 |
| Feb. 13, 1944 | _____do_____ | 3278525 | _____do_____ | 10,000 |

On June 21, 1937, the Thornley Supply Co. executed an assignment whereby all of its right, title, and interest in policy No. 2801811 were assigned to National. Subsequently, policies Nos. 3268889 and 3278525 were similarly assigned to National.

Copies of the corporation insurance trust agreement and the amendment thereto were transmitted to the Northwestern Mutual Life Insurance Co. and were on file with said company.

When Albert died on August 25, 1958, the aggregate surrender value of the eight policies on petitioner's life held by the trustee under the insurance trust agreement was $16,610.83.

From and after the execution of the amendment to corporation trust agreement, the Thornley Supply Co. paid all premiums thereafter due on policies held by the trustee under the said trust. No portion of such premiums was reported by petitioner as income in any year. The premiums periodically paid by Thornley Supply Co. were charged or debited to an account "Life Insurance Premiums." At the end of each year, the amount of the annual aggregate increase in the cash surrender value of the policies on the life of petitioner and on the life of Albert would be credited to such "Life Insurance Premiums" account with a corresponding charge or debit to an asset account entitled "Cash Surrender Value—Life Insurance." Any excess of the premiums paid on the policies in each year over the increase in cash surrender values would be separately credited to the "Life Insurance Premiums" ac-

count, with a corresponding charge or debit to "Earned Surplus," so that at the end of each year the "Life Insurance Premiums" account would have no balance.

The cash surrender value of policies on petitioner's life held by the trustee under the insurance trust agreement was recorded on the books of the Thornley Supply Co. as an asset at the end of each of the years 1953 through 1962, inclusive.

Prior to December 31, 1958, the cash surrender value of policies on Albert's life was being carried on the books of Thornley Supply Co. at $18,957.57. As of August 31, 1958, the actual cash surrender value of the policies on Albert's life was $19,483.57. A previously unrecorded increase in the cash surrender value of a policy on petitioner's life, in the amount of $2,000, was discovered on or about December 31, 1958. To reflect the maturity value of policies on Albert's life ($42,000) resulting from his death on August 25, 1958, and to reflect the previously unrecorded increase in the cash surrender value of the policies, the following entries were made on the books of the Thornley Supply Co. as of December 31, 1958:

| | | |
|---|---|---|
| Debit: Cash Surrender Value—Life Insurance | $25,042.43 | |
| Credit: Paid-In Surplus | | $22,516.43 |
| Earned Surplus | | 2,526.00 |

To record balance of proceeds of A. L. Thornley Insurance plus increase in value of C. J. Thornley Insurance.

As a result of these entries, "Cash Surrender Value—Life Insurance" is reflected on the corporate records as of December 31, 1958, as an asset in the amount of $60,610.83, consisting of $42,000 representing maturity values on those policies on Albert's life and $18,610.83 representing the corrected cash surrender value on those policies on petitioner's life.

After Albert's death, negotiations began with respect to the price to be paid for Albert's stock. On or about September 30, 1959, it was agreed that the price of Albert's stock should be $55,000. This was $13,000 more than the proceeds of the insurance on Albert's life.

The policies on petitioner's life held subject to the insurance trust agreement were delivered by the trustee to petitioner on February 19, 1960. The trustee had retained the policies until an agreement was reached with respect to the purchase price of Albert's stock. Petitioner's stock, which had also been held by the trustee, was delivered to him on November 4, 1960. From the date of Albert's death until February 19, 1960, neither petitioner nor anyone representing him made any request or demand on the trustee for the delivery of the

policies on petitioner's life. During this period the trustee made no offer to deliver such policies to petitioner or anyone representing him.

The respondent's position is that, at least from March 29, 1951, until Albert's death in 1958, the eight insurance policies on petitioner's life belonged to Thornley Supply Co. and that when the insurance trust terminated upon Albert's death and petitioner thereupon became entitled to receive the eight policies on his life, a distribution of corporate property was effected. The petitioner, on the other hand, contends that as of 1958 the incidents of ownership in the eight insurance policies on petitioner's life were not vested in the Thornley Supply Co. and that, consequently, these policies were not distributed to petitioner by that company. In the alternative, petitioner contends that even if the Thornley Supply Co. was in 1958 the owner of the eight policies on petitioner's life the policies were not distributed to the petitioner until 1960. The issue is one of fact.

As to the insurance policies numbered 2722388, 2839371, 2839372, 2839373, and 2839374, we think the weight of the evidence supports petitioner's contention that said policies were never legally or beneficially owned by the Thornley Supply Co. The record discloses that these policies were applied for by the petitioner, that the named beneficiary was the trustee under the insurance trust agreement, and that petitioner at all times reserved the right to change or revoke the beneficiary designation, to borrow on the policies, and to surrender the policies for their cash values. The possessor of such rights is usually recognized as the owner of the policy. *Estate of Ethel M. Donaldson*, 31 T.C. 729 (1959).

Respondent argues, however, that petitioner, by the 1951 amendment to the corporation insurance trust agreement, surrendered these incidents of ownership since the exercise of these rights thereafter required the concurrence of the Thornley Supply Co. Although the insurance trust agreement, as amended, did provide in effect that the exercise of rights under the policies was to be by the joint action of the stockholders and the Thornley Supply Co., we find it difficult to believe that in view of petitioner's and Albert's absolute control over the Thornley Supply Co. that entity, regardless of any possible right it might possess, would have taken any action to prevent petitioner's exercise of his rights under the aforementioned policies. As was noted by the Court of Appeals in *Golden* v. *Commissioner*, 113 F. 2d 590 (C.A. 3, 1940), affirming 39 B.T.A. 676 (1939), "One may observe in passing that adversity of interest as between a close corporation and its stockholders is questionable to say the least."

Respondent also points to the fact that after 1951 the corporation paid the premiums and listed the policies as an asset on its books. Such facts are important and have been given full weight. See and

compare *Lewis* v. *O'Malley*, 140 F. 2d 735 (C.A. 8, 1944) ; *Cummings* v. *Commissioner*, 73 F. 2d 477 (C.A. 1, 1934), affirming 28 B.T.A. 1045 (1933). However, they are not conclusive.

Finally, the respondent contends that corporate ownership of these five policies is further evidenced by the fact that the proceeds of the policies would have inured to the benefit of the Thornley Supply Co. had petitioner predeceased Albert. In *Burnet* v. *Wells*, 289 U.S. 670 (1933), the Supreme Court stated that:

One who takes out a policy on his own life, after application in his own name accepted by the company, becomes in so doing a party to a contract, though the benefits of the insurance are to accrue to some one else. * * * The rights and interests thereby generated do not inhere solely in those who are to receive the proceeds. They inhere also in the insured who in cooperation with the insurer has brought the contract into being. * * *

Thus, the fact that the Thornley Supply Co. was a contingent beneficiary would not necessarily defeat or be inconsistent with petitioner's claim of ownership. *Burnet* v. *Wells, supra.*

As previously noted and for the reasons set forth above, it is our conclusion that the petitioner and not Thornley Supply Co. was the owner of policies numbered 2722388, 2839371, 2839372, 2839373, and 2839374. Such being the case, the petitioner did not receive a distribution in 1958 from Thornley Supply Co. to the extent of their cash value.

We must now consider whether Thornley Supply Co. was the owner of policies numbered 2801811, 3268889, and 3278525. The record discloses that the three policies were originally issued upon the application of the Thornley Supply Co., that the proceeds were payable to Thornley Supply Co. upon the death of petitioner, and that the application for each policy provided that the policy "shall belong to and be under the control and disposition of the beneficiary corporation [Thornley Supply Co.] without the consent of the insured." The record also reveals that prior to the amendment to the insurance trust agreement the Thornley Supply Co. assigned all of its right, title, and interest in the three policies to the trustee under the insurance trust agreement, and that after the execution of the amendment to the insurance trust agreement the Thornley Supply Co. paid all premiums due on said policies and listed said policies as an asset on its books.

There seems to be no dispute, nor do we believe one could exist, that the Thornley Supply Co. was the owner of the three policies as of the date they were originally issued. Petitioner contends, however, that the Thornley Supply Co.'s interest in said policies was divested by its assignment of all its right, title, and interest in the policies to the trustee under the insurance trust agreement. Although we have serious doubts as to whether the trustee under the insurance trust agree-

ment actually acquired any substantial rights in the three policies assigned to it by the Thornley Supply Co.,[1] the matter need not be resolved. Whatever ownership rights may have been surrendered by the Thornley Supply Co. pursuant to its assignment were regained upon the execution of the amendment to the insurance trust agreement. The amendment, insofar as here pertinent, provided that the Thornley Supply Co. was to be a party to the agreement and that the—

> trust shall cover in respect to such policies only the money that may accrue or become payable thereon at the death of the respective insured, and during the lifetime of the insured under any of said policies *the Stockholders and the Company may together,*[2] *but without the consent of the Trustee, exercise every right and privilege which either of the Stockholders or the Company may have under any of said policies and may otherwise deal with said policies in any manner permitted thereby,* * * *. [Emphasis added.]

Since the amendment was subsequent to the assignment and deals with the same subject matter as the assignment, we construe it to be the parties' latest expression of intention with regard to the insurance policies.

In view of the fact that after the execution of the amendment to the insurance trust agreement in 1951, the Thornley Supply Co. possessed the incidents of ownership in the policies numbered 2801811, 3268889, and 3278525, paid all the premiums due thereon, and listed the policies as an asset on its books, it is the opinion of this Court that as of the date of Albert's death the Thornley Supply Co. was the owner of said policies.

Having so concluded, we must now consider what effect, if any, the death of Albert had upon the corporate ownership of these policies. Paragraph (8th) of the insurance trust agreement, as amended, provided, in part, that upon the death of either stockholder the agreement was to terminate and the trustee was to deliver to the survivor all of the insurance policies on his life. Since the policies to be delivered to petitioner pursuant to the insurance trust agreement included those owned by the Thornley Supply Co., it is apparent that after Albert's death petitioner became the equitable, if not the legal, owner of said policies and entitled to receive them from the trustee. Such being the case, a taxable distribution of corporate property was effected upon the death of Albert.

---

[1] This thought stems from the fact that the trust agreement specifically provided, paragraph (1st), that "This trust shall cover in respect to such policies *only the money that may accrue or become payable thereon at the death of the respective insured.*" (Emphasis added.) If the trust was so restricted, query, whether the Thornley Supply Co., which at this time was not a party to the trust agreement, could by its own act enlarge the powers of the trustee.

[2] Although the exercise by the Thornley Supply Co. of its ownership rights in the three policies was purportedly dependent upon stockholder acquiescence, we, here again, find it difficult to believe that petitioner and Albert, whose interests were allied with rather than adverse to those of the Thornley Supply Co., would have prevented the exercise of these rights.

Petitioner contends, however, that if a taxable distribution of corporate property did in fact take place, it did not occur until sometime in 1960. In support of this position, petitioner points to the fact that the policies were not actually delivered to him until February 1960.

The doctrine of constructive receipt treats as taxable, income that is unqualifiedly subject to the demand of a taxpayer on the cash receipts and disbursements method of accounting, whether or not such income has actually been received in cash or kind. *Ross* v. *Commissioner*, 169 F. 2d 483 (C.A. 1, 1948), reversing on other grounds a Memorandum Opinion of this Court; *Theodore H. Cohen*, 39 T.C. 1055 (1963). The circumstances of the instant case disclose that pursuant to the terms of the insurance trust agreement, as amended, an agreement to which the Thornley Supply Co. was a party, the petitioner, a cash basis taxpayer, upon the death of Albert became entitled to receive the policies on his life held by the trustee, and that the insurance trust agreement, as amended, contained no conditions or restrictions on petitioner's right to receive the policies. The record also reveals that petitioner made no demand to the trustee for the delivery of the policies and that the trustee made no offer to deliver the policies to petitioner until the arrangements in connection with the sale of Albert's stock had been completed.

We think the doctrine of constructive receipt may be invoked in the presence of such circumstances. By the unambiguous terms of the insurance trust agreement, as amended, petitioner had an unqualified right to receive all of the insurance policies on his life upon the date of Albert's death. Furthermore, the petitioner offered no evidence that such policies would not have been delivered to him had he made a demand upon the trustee or that the trustee was acting within its authority by withholding the policies until the sale of Albert's stock was consummated. In view of the aforegoing, we hold that the petitioner in 1958 received a taxable distribution to the extent of the cash value of policies numbered 2801811, 3268889, and 3278525 from the Thornley Supply Co.

*Decision will be entered under Rule 50.*